Nicholson, C. J.,
delivered the opinion of the Court.
In January, 1864, defendant made the acquaintance of plaintiff, at the house of her father, in Franklin County, Tennessee. He came from Paducah, in Kentucky, and settled in Franklin County, where he owned a large, real and personal estate. He was a married man, but left his wife at Paducah. Plaintiff graduated at the Winchester Female Academy, in 1849 or 1850. She was poor, but of good character and respectable family. For several months after his acquaintance commenced, he was a frequent visitor at her father’s house. The result of these visits was, that in April, 1864, defendant became so much enamored of plaintiff, that he made formal proposals of marriage. Although she returned the attachment, she declined to accept or to reject his proposals. He pressed his suit until July, 1864, when he wrote to her, repeating his “warm and sincere love,” and assuring her that “one word would make him the happiest man in Tennessee,” and insisting on having her decided answer. To this letter, she responded; and on. the 12th of July, 1864, he acknowledges its receipt, and says its “contents are sweet to me.” The fair inference is, that in that letter, for the first time, she accepted his proposal of marriage. In further answer to her letter *371 he proceeds to say: “And with all said, the subject you approached me with, and as often I have evaded, shall in this be explained. I will try to explain to satisfy you. I always told you I was free — do not get vexed at rue — I thought I was free forever. One year ago, we agreed to separate. All things were fixed — papers were all arranged, but not signed’. I was indifferent about it, as at that time I never expected to marry again. She came up last spring, and agreed to have them fixed up, and' I felt well about it, and spoke of it to you. Veil, I sent down to my lawyer, in Paducah, to have those papers signed and sent to me. When I came to Nashville, I got a letter from my counsel, that he could not get her to sign the papers. * * Lethia, it shall be fixed all right, but you keep things still for a while; things will all come right in good time. I shall remain yours, let it cost what it may, and I pray God that you will remain the same to me. * * If you should look at this thing any different to what you have, or from what I do, I hope you will forgive me, and if nothing more, let me be your frieud, and look after your welfare.”
This letter discloses the fact that he had secured the affections and won the confidence, and procured the favorable response of plaintiff, to his proposals of marriage, by the false and fraudulent representation, that he was free to make a marriage contract. It discloses, also,; that he had made known to her the fact of his having been married, and that an arrangement had been made by which he was free from his former obligations. The knowledge of these facts furnishes a probable explanation *372 of the hesitancy of plaintiff, from April to July, in responding positively to his proposals.
It is fairly deducible from this letter, that plaintiff accepted his proposals, under the belief that he was in a condition to make the contract, and that she was now informed, for the first time, that he had misrepresented his true Condition. But it will be observed, that whilst he confesses that he had deceived her, he assures her that “things will all come right in good time,” and begs her to remain the same to him, and assuring her that she was the only one he ever loved so dearly. These assurances, that “things would come right in good time,” and that he desired her “to remain the same to him,” and his protestations of ardent love, were evidently intended to induce her to continue the engagement, notwithstanding the obstacle then in his way, to their marriage.
He was successful in inducing her to adhere to her promise, to marry him. She met with him at Nashville, and soon afterward wrote to him, renewing, in terms entirely satisfactory to him, her pledges of fidelity and devotion. On his part, he renewed by many letters, in quick succession, his determination to be immediately freed from his oblig ations to his wife; and on the 23d of Sept., 1864, left for Paducah, assuring her that on that trip he would be made free, and that in a few days he would return, and then they would “have their bliss,” signing himself, “your loving husband or I will be in a short time.”
Defendant’s visit to Paducah failed to remove the obstacle to the consummation of the “ bliss” which he • so *373 confidently assured plaintiff was in store for them. But failure and disappointment were only followed by renewed assurance of ultimate success, and of unabated devotion on his part, whilst she submitted with fortitude to her fate, growing stronger and stronger in her coufidence in and her devotion to him, but manifesting at times decided 'impatience at the delay. Completely absorbed in her love for him, and never doubting his sincerity and truth, she was completely under the dominion of her passion for him. On the 2d of April, 1865, she writes: “Dearest Eugene: There is for us a crisis approaching. Well did you truly remark, the struggle had come. It is upon us. in good earnest. I implore you by all that you hold sacred, by your great love for your devoted Lethia, to finish up immediately, without one moments delay, that affair in Kentucky. Let it cost what it may. If it cost all that you have, let it go. Let you but return to me and say, Lillie, it is finished, and I will be ten thousand times more happy than I would be if you were to say Lillie, I am a millionaire. Rather than have things take the turn I see they are taking, I would rather live in a log cabin with a dirt iioor and eat hog and hominy. Pride has ever been my weak side.”
On the 2d of July, 1865, she addressed to him a long letter, abounding in passionate ebullitions of love and sadness, mingled with extensive extracts from works of poetry and fiction; and again, on the 7th of July, 1865, she writes to him in the same strain of confiding passion and devotion. On the 16th of July, 1865, he writes to her; and after repeating his devotion, he says: “ I *374 have spoken things that were not true — you know what it was done for — it was done for this, to forward our marriage and get rid of one that I hate.” On the 18th of July, ’65, he writes to her: “I am going to Padu-cah this week, to finish up all my business, I hope, never to return again.” And on the 19th of July, 1865, he writes to her again, and says to her: “I shall, I think, leave Nashville some time this week. I think I can get all my business settled up by the 5th of August, and you and I start on our tour by the 16th of August; I hope so at least. I think her coming up to Decherd will speed our happiness.”
The correspondence was kept up in the same strain until November, 1865, plaintiff never wavering in her passionate devotion; and defendant repeating in his frequent letters his ardent love, and renewing the assurances that all would be right. At his request, she had withdrawn from society, and was living in secluded retirement. She thus gratified him, and cut herself off from communication with all except him. He closed his last letter, dated Nov. 2, 1865, by saying: “I«can not part with you, nor do I intend to. Things will come all right.' Keep up good cheer; do not let your heart fail in the last hour of trial.”
In July, 1865, plaintiff having abandoned all hope of the fulfillment of his contract by defendant, commenced an action of trespass on the case for breach of marriage promise, in the Circuit Court of Franklin county.
After pleadings were made up, the defendant filed affidavits and moved the Court to change the venue, which *375 motion was sustained; and the Court thereupon ordered the cause. to be transferred to Marion county for trial. Exception was taken to this order of the Court by the plaintiff.
After the cause was transferred to Marion county, plaintiff filed affidavits and moved the Court to transfer the cause back to Franklin county, "which motion was overruled, as well as a motion afterwards made to strike the cause from the docket; to all which action of the Court the plaintiff excepted.
At the March Term, 1869, of the Marion County Circuit Court, the cause was tried, and a verdict returned for the defendant, upon which there was judgment. Upon the discharging of a motion for a new trial, the plaintiff appealed in error to this Court.
The most important question in the case is, whether there was error in the charge of the Circuit Judge to the jury, in view of the facts given in evidence. That portion of the charge on which the question is raised, is as follows:
“If the plaintiff was legally free to contract and consummate marriage, and the defendant was not, because of a then existing marriage, and the parties entered into such a contract, the plaintiffs having no knowledge of the defendant’s disability to consummate it, the defendant would be liable, * * * * But to authorize a verdict for the plaintiff under this last stated proposition, the testimony must show the plaintiff to have acted in legal good- faith — she must have been wholly ignorant of the want of legal ability, on the part of the defendant, at the time of the contract; and, if afterward, it came to her knowledge, and she took steps, or sought *376 in any way to procure or secure its execution, or gave her consent thereto, knowing its illegality, she would thereby so place herself in the wrong, as to require her exclusion from Court. In such case, the law would require you to find the issues in favor of the defendant.”
There are three counts in the declaration; the two first allege that plaintiff being unmarried, at the special instance and request of defendant, promised to marry the said defendant, and the defendant then and there promised to marry the plaintiff; the first count alleging in a reasonable time, the second count omitting .any allegations as to the time of marriage, &c. The third count alleges, that, in consideration that the plaintiff being sole and unmarried, at the request of the defendant, who falsely and fraudulently represented himself to be sole and unmarried, promised defendant to marry him within a reasonable time; and the plaintiff, confiding in defendant’s promise and undertaking, has hitherto remained unmarried, and has always been ready to marry the defendant, until she had notice he was a married man; and the plaintiff avers that the defendant has not married her, but on the contrary, at the time the defendant made his promise, he was married, and still is married, to another woman.”
The evidence in the cause proves that the contract of marriage was made in July, 1864, and that, at the time, defendant was a married man, but represented himself to be unmarried, and that the fact of his being, at the time, a married man, was not known to plaintiff. Upon these facts the Circuit Judge charged the jury *377 correctly, that plaintiff would be entitled to recover. But be added, if afterwards it came to ber knowledge that be was a married man, and she took steps or sought in any way to procure or secure the execution of the contract, or gave ber consent thereto, knowing its illegality, she would thereby exclude herself from court. If we rightly comprehend the language of the Judge, he intended the jury to understand that, although the plaintiff would be entitled to recover if she was ignorant of defendant’s being married, yet, if she did not repudiate the contract when she obtained knowledge that he was a married man, she would not be entitled to recover.
To apply this charge to the facts before the jury: It was in proof that, early in July, 1864, the contract was expressly made, though for several months the .proof shows that there was an implied promise on both sides. As plaintiff did not know that defendant was married, it was a lawful contract on her part, and she was entitled to damages for its breach. But the proof further showed, that in a short time after the making of the express contract, plaintiff' was apprised of the fact that defendant was a married man; and the jury was instructed that, if upon obtaining this knowledge, she did not repudiate the contract, but was still willing to carry it out in a reasonable time, she would thereby forfeit all right to recover. Whatever may be our views, as a question of propriety and morality, as to the course plaintiff ought to have pursued when she obtained knowledge that she had made a contract of marriage with a man who was then disabled from executing the contract by reason of his being then married, we do not under *378 stand that she forfeited her right to damages, by waiting a reasonable time to see if he might not be able, lawfully, to execute his contract.
In 2 Saunders • on- Pleading and Evidence, 347, a declaration is set out, of which the declaration in the present cause is a copy, on which the plaintiff obtained a verdict. “On motion to arrest the judgment, held, that the declaration showed a sufficient consideration. Wild v. Harris, 13. Jur., 961; 18 L. J., 297, C. P.; held, also, that the defendant’s promise was not unlawful, there being, at the time the promise was made, a possibility of performance, as the defendant’s wife might have died within a reasonable time. lb. Held, also, that the allegations that the plaintiff remained unmarried for a reasonable time, was a sufficient consideration, as being a prejudice to her, caused by the conduct of the defendant.” lb.
In Chit, on Contr.; 468, is laid down that “the promise of a man to marry within a reasonable time, is not void, although he was married at the time of making such promise, because his wife might have died within a reasonable time.”
Whilst we can not yield our assent to this doctrine in its full extent, we do approve the doctrine found in Addison on Contracts, 678, that “if the party making the promise, was married at the time it was made, and consequently, incapable of entering into the contract, or of performing it, the incapacity constitutes no excuse for non-performance, unless it was known to the other contracting party at the time the promise was made and accepted.”
*379 It is clear, that when plaintiff obtained knowledge that the defendant had not the capacity, by reason of his having a wife, to execute his contract, after waiting a reasonable time, she could have sued and recovered for a breach of the contract. To such an action, defendant could not have made the defense that he was married, when he made the promise, for the purpose of defeating the action. If defendant could have defended such an action, brought within the time for the limitation of actions on the case, by showing that after she had knowledge of his being married, she consented to the continuance of the contract, or took steps to procure its consummation, such proof could only have been legitimate in mitigation of damages, but not to defeat her right of action. 2 Saund. PI. and Ev., 348.
But to determine whether the plaintiff forfeited her right to recover full damages, by an unreasonable delay in suing, or by any conduct beyond the simple delay, it is necessary to look to the facts as they existed at the time she learned that defendant was a married man, and to the circumstances which controlled her in delaying her action. It will have been seen by the history of the case, as we have given it, that it was not until the plaintiff had expressly accepted his proposal of marriage, that he communicated to her the fact that he was not then free to marry her. He withheld this fact from her, until, by his persistent appliances, he had secured her affections and her confidence. He had told her that he had been married, but he had also assured her that he was then free to marry again. But after *380 lie became satisfied that be was secure in having won her love and her confidence, he disclosed to her the fact, that he was not then free to marry her, as he had before thought, and as he had told her he was, but that he was not free from his wife, simply because from oversight or negligence, the papers for their separation, which had been prepared and agreed on, had not been executed. He assured her, in substance, that this was a mere matter of form; that he would have no trouble in arranging it. She confided in and believed him. It is possible that he was honest in these assurances, but whether he was acting honestly or fraudulently, she believed his statements, and doubted not, that within a short time, the slight obstacle in the way of the marriage, would be removed. In her situation, it was not probable that she would suspect the fraudulent device to w'hich he was resorting, to continue the dominion which he knew he had acquired over her. From the moment she yielded to him her heart, and agreed to become bis wife, she became an easy victim of his misrepresentations. When he wrote to her, that he would soon be free to marry her, she believed him, because she loved him, because she was already in vin-culis.
To hold that she lost her right to full damages by delaying to sue under such circumstances, would be to . hold that defendant could avail himself of his fraud in procuring her to delay, in order to relieve himself of his liability for damages for the original fraud in procuring from her a promise of marriage. So far from being *381 relieved from the liability growing out of his original fraud, by exerting his power over her to induce her not to repudiate the contract on her part, he estopped himself from relying on such a defense, if she delayed at his urgent request, or if she did so in consequence of his false and fraudulent representations. His conduct, if fraudulent, in procuring her to continue her promise, after she knew that he was married, -would be an aggrava-vation of his fraud, in imposing upon her ignorance in the first instance.
By reference to the history of his conduct from July, 1864, to the close of the next year, it is in proof, that day after day, week after week, and month after month, he continued his efforts, by urgent and passionate appeals, and by a succession of false promises, operating upon her hopes, to still further influence her passions, and to induce her not to repudiate her engagement. This artful and effective scheme of influencing the plaintiff, situated as she was, seems to have been successfully practiced down to his last letter in ÜSTovember, 1865, in which' he still repeated his assurances of an early consummation of their hopes, and his urgent request that she should adhere to her promise.' During all this time, her passionate devotion to him, whilst it blinded her to his fraudulent devices, subjected her to his constant and continuing influence. Under such circumstances, it was error in the Circuit Judge to tell the jury that plaintiff must be excluded from Court if she failed to repudiate the contract, upon learning that defendant was a married man. The jury ought to have been left to determine the fact, whether *382 she was not induced to continue to assent to and recognize the contract by the influence exerted over her by the defendant.
They ought to have been told that if, after she learned he was a married man, she freely and understaudingly, and uninfluenced by fraudulent misrepresentations, consented to the continuance of the contract, or took steps to secure its consummation, they might look to such facts in mitigation of damages, but that such proof would not defeat her right of action. In charging that such proof would exclude her from Court, and defeat her right to recover, there was clear error.
In the next place, it is insisted for the plaintiff that the Circuit Judge erred in ordering the venue to be changed from Franklin to Marion county. The affidavits, on which the venue' was changed, state that defendant could not have a fair trial in Franklin county, on account of the prejudice existing against him in .that county; but they do not designate any of the adjoining counties as being subject to like exceptions. It is to be presumed, therefore, that none of the adjoining counties were subject to the like exceptions. Upon determining that the affidavits of the defendant and his other witnesses were sufficient for a change of venue, it was the duty of the Judge, under the law, to send the cause “to the nearest adjoining county, free from like exceptions, whether in the same judicial circuit or out of it.” Code, 2839. The fair interpretation of the law is, that the venue should only be changed to a county out of the circuit, where such county was the nearest, free from like exceptions. If the nearest county should be in the *383 circuit, but should not be free from like exceptions, then the venue might be changed to a county out of the circuit, not subject to like exceptions. But in the present case, none of the adjoining counties were shown to be subject to like exceptions, and, therefore, it was imperative on the Judge to send the cause to the nearest county.
This raises the question: “Was Marion county the nearest county to Franklin, and how was the judge to determine the fact? The Judge could take judicial notice of the local divisions of the State into counties, cities, towns, and the like, and of the relative positions of such local divisions. 1 Greenl., § 6. He was bound, therefore, to know, judicially, that Colfee, Lincoln and Grundy counties, in the same circuit, and Bedford and Marion counties, not in the same circuit, were all adjoining-counties to Franklin. The law required him to send the cause to the nearest of these five counties. What is meant in the statute by the nearest county? In one sense, none of them are nearest, as all are adjoining to Franklin. We must interpret the language so as to carry out the object of the Legislature. The object most clearly was to require the Judge to accommodate his action to the convenience of the parties and witnesses in the cause. This was to be done by sending the cause to the nearest county, meaning that county whose Court-house was nearest to that of Franklin county. He knew, judicially, or ought to have known, that the Court-house of Marion county, instead of being the nearest, was the most distant of the five adjoining counties; and for that reason, as well as on account of *384 tbe character of tbe country, tbe most inconvenient for parties and witnesses. It was, therefore, error to transfer the cause, for trial, to Marion county.
It is also insisted that the Circuit Judge erred in overruling the motion of plaintiff to transfer the cause back from Marion to Franklin county, under the provisions of the Act of 1867, c. 36, s, 8. We should hold that there was error in overruling this motion, but for the fact stated in argument by defendant’s counsel, that this Act had been repealed by an Act passed on the 12th of March, 1868. We know, judicially, that the Circuit Court of Marion county commenced its March Term, 1868, on tbe second Monday of that month, which was the 9th day thereof; but the record fails to show on what day of the term said motion was made and overruled. We think it probable that the motion was overruled before the Act of 1867, c. 36, s. 8, was repealed; but as there is some uncertainty as to this fact, and as the decision of this alleged error is unimportant, we do not decide it.
For the errors indicated, the judgment below is reversed, and the cause remanded to the County of Franklin, for a new trial, and with instructions to the Clerk of the Circuit Court of Marion county to transmit, without delay, all the original papers, and the orders made in the cause, to the Clerk of the Circuit Court of Franklin County.